# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**RICHARD MAACK,**

                        **Plaintiff,**

**-vs-**                                              **Case No.  6:12-cv-612-Orl-28TBS**

**SCHOOL BOARD OF BREVARD
COUNTY,**

                        **Defendant.**
_____

# ORDER

Richard Maack brings this action against his former employer, the School Board of Brevard County, alleging interference with leave under the Family and Medical Leave Act ("FMLA"),[1] discrimination under the Americans with Disabilities Act ("ADA"),[2] and retaliation under both the FMLA and the ADA.  The School Board has moved for summary judgment on all claims,[3] and as set forth below that motion must be granted.

## I.  Background

Maack began working for the School Board in 1996 as a custodian.  In 2004, he was promoted to the position of Maintenance Helper, and shortly thereafter he was promoted to

_____

[1]29 U.S.C. § 2601 et seq.

[2]42 U.S.C. §§ 12101-12213.

[3]The pertinent filings are:  Defendant School Board of Brevard County's Dispositive Motion for Summary Judgment (Doc. 32); Plaintiff's Response in Opposition (Doc. 39); and Defendant's Reply (Doc. 42).

Electrician I and then to Electrician II, the position he held until his employment ended in 2010.   Maack's work schedule was Monday through Thursday, ten hours a day.   His immediate supervisor during the time period at issue here was Ira Fox, who held the position of Supervisor of Maintenance and Structures.   (See Fox Dep., Def.'s Ex. Q, at 7).   Fox reported to Jim Hudson, the Maintenance Coordinator, and Hudson reported to Walt Petters, the Director of Maintenance.

During the last two years of his employment, Maack's performance appraisals were generally positive but indicated an issue with attendance.   In other words, when Maack worked, his work was satisfactory, but sometimes he did not show up to work or call anyone at the School Board to advise that he would not be at work.   For example, Maack's 2008-2009 appraisal, which was completed on January 28, 2009, indicated that Maack "need[s] to make sure he calls his supervisor in a timely manner when he will not be at work," and his 2009-2010 appraisal, dated January 28, 2010, noted "[n]eeds to work on his attendance." (Performance Appraisals, Ex. L to Def.'s Mot. Summ. J. & Ex. A to Pl.'s Resp.).

Medical records submitted by both parties indicate that Maack suffered from several medical problems and illnesses during the last few years of his employment, including Eppstein-Barr virus, arthritis, anxiety, chronic myofascial pain, and back pain.[4]   It is also undisputed that in at least 2009 Maack struggled with an addiction to pain medication.

---

[4]Records from a September 2008 doctor visit indicate that on that date Maack complained of sudden lower back pain after he tried to pull some wire forcefully.   (Pl.'s Ex. B at 4).   Maack was prescribed Percocet during that office visit.   (Id.).   A back strain and chronic lower back pain are noted throughout Maack's medical records.   (See Pl.'s Ex. B & Def.'s Ex. E).   In his deposition, however, Maack denied ever having suffered a back injury. (Pl. Dep., Def.'s Ex. A, at 15).

Maack maintains that many of his absences were due to medical conditions, but the parties dispute the extent to which the School Board was aware of these conditions and whether any of Maack's medical problems entitled him to FMLA leave or an ADA accommodation.

As noted in a "Summary of Time" submitted by both parties,[5] Maack was issued an "oral warning reduced to writing" on January 9, 2009, for "no call, no show." (Summary of Time at 1; Oral Warning Reduced to Writing, part of Def.'s Ex. C).  On October 29, 2009, Hudson sent Maack a memorandum regarding excessive absenteeism that stated in part: "Please be advised that due to your excessive absenteeism any future absences shall require that you submit a physician's note for the day(s) of your absence. . . . We are concerned about your health and continued employment with the District, therefore, if there is any service we can provide to assist you in improving your attendance, please feel free to call upon us." (Pl.'s Ex. C).  Three weeks later, on November 18, 2009, Hudson set Maack a letter via certified mail that stated:

> You have been absent without an approved leave of absence since October 22, 2009, you returned to work for thirty minutes on November 9, 2009 and then left for the day and did not return for the rest of the week.  On Friday, November 13, 2009, you spoke to your supervisor, Ira Fox[,] and advised him that you would return to work on Monday, November 16, 2009.  You failed to return to work on Monday, November 16, 2009 and have been absent Tuesday, November 17 and Wednesday, November 18, 2009, also, you have not called your supervisor to report your absence.
> If you do not return to work on Monday, November 23, 2009 at your assigned work time and to your assigned work location, Brevard Public Schools will accept your non-attendance as your resignation.

---

[5](See Def.'s Ex. D & Pl.'s Ex. G).

(Pl.'s Ex. D).   Evidently Maack appeared for work on November 23; his employment continued, and no absence is noted on the "Summary of Time."

Maack testified in his deposition that in October 2009 he told his temporary supervisor, Jim Varney, that his doctor had prescribed hydrocodone and was going to "do a detox" and that Maack would be out of work during that time.  (Pl. Dep. at 24-25). According to Maack, Varney responded, "Get clean, Rich.  I'll tell everyone.  It'll be taken care of."[6]  (Id. at 25).  Maack states that from October 22 to November 9, he was at home but under a doctor's care, being slowly taken off of the prescription medication he had been on for a few years.  (Id.).  Maack denied that he was abusing painkillers prior to October 22 but stated but his body was dependent on them.  (Id.).  He also denied that his attendance problems were related to his dependency on painkillers.  (Id.).

Notes from a doctor visit on October 19, 2009—just before his absences began on October 22—indicate that Maack complained of pain in different parts of his body since he ran out of Percocet, that "he was buying oxycontin from street to control his pain," and that he cannot function "without these meds."  (Pl.'s Ex. B at 11).  On that date, the doctor renewed Maack's Percocet prescription but also referred him to drug rehab.  (Id.).  Maack

---

[6]Maack testified in his deposition that Varney was his "temporary supervisor" in October 2009 because Ira Fox was out for back surgery.  (Pl. Dep. at 24).  For summary judgment purposes, the Court accepts as true Maack's testimony that Varney told him not to worry about taking time off, though Hudson stated in an affidavit that Varney was not Maack's direct supervisor and that "no supervisor is authorized to allow an employee to miss work for an indefinite period without complying with the leave requirements of the School Board," (Hudson Aff., Def.'s Ex. G, ¶ 8).  Hudson further states that prior to this lawsuit, he had never been advised of an assertion by Maack that Varney orally authorized Maack to take time off and that during the times he met with Maack to discuss attendance issues Maack never made such a claim.  (Id. ¶¶ 7 & 9).

explained in his deposition that when he returned to work on November 9, he had detoxed and was off of the pain medication.  (Pl. Dep. at 26).  He agrees that he did not show up to work or call in several days later in November, but he explained that he did not show up because without the medication it was harder to work ten-hour days.  (Id.).

The next entry on the "Summary of Time" is for Monday, March 8, 2010:  "Called Ira to say he would be late, never came in never called to say not coming in."  (Summary of Time at 1).  Maack was also a "no call, no show" on March 9, and on Wednesday, March 10, he called at 6:42 a.m. and said he was not coming in that day or the next but would call Ira Fox on the following Monday.  (Id.).  He did not call or show up on Monday, March 15, but he called on Tuesday, March 16, to say he would be out that day and would return on Wednesday, March 17.   The Summary of Time indicates that on March 17, Maack "[r]eturned to work with forged note, outside getting sick in a garbage can, meeting with Jim Hudson and Ira given numbers to call when out, sent home."  On Thursday, March 18, Maack was a "no call, no show."  On Monday, March 22, Maack called Ira Fox and said he was not coming in that day, that he had a doctor's appointment the following morning at 8:30 a.m., and that he would be in after that appointment with a note for his absences.  However, Maack did not call or show the next day or the rest of that week.

On March 26, 2010, Hudson sent Maack a certified letter that stated:

> You have been absent without an approved leave since March 8, 2010.  During this time you have only reported for work on one occasion, presented an altered doctor's note and were sent home as you were getting sick outside your Supervisor's office.  You have reported to your Supervisor on two separate occasions that you would be reporting to work late and never showed.  On two other occasions you[] reported your absence

> to someone other than your Supervisor and have been a no call
> and no show for seven work days.
> If you do not return to work on Tuesday, March 30, 2010 at your
> assigned work time and to your assigned work location and
> present documentation for your absences, Brevard Public
> Schools will accept your non-attendance as your resignation.

(Pl.'s Ex. F at 2).  Maack did not call or show on Monday, March 29, but on March 30 he

returned to work with a doctor's note for March 25.  (Summary of Time at 1).  A disciplinary

meeting was scheduled for March 31 at 2:30 p.m.  However, Maack did not call or show on

Wednesday, March 31, or Thursday, April 1.  (Id.).

On Monday, April 5, Maack returned to work with a doctor's note and met with Hudson

and Fox.  (Id.).  On April 6, a disciplinary meeting was held and a Letter of Reprimand was

issued for failure to report to work.  (Id. at 2).  On that date, Maack acknowledged receipt of

an Oral Warning Reduced to Writing, and the next day, Maack acknowledged receipt of the

April 6 Letter of Reprimand.  (Pl.'s Ex. I).  Both of those documents warned Maack that

"[f]ailure to immediately improve your work ethics [sic] shall result in further disciplinary

action and will be reflected on your annual evaluation."  (Id.).

Also on April 6, Hudson referred Maack, through the School Board's Employee

Assistance Program ("EAP"), to a psychologist for an evaluation.  (See Def.'s Ex. K).  The

referral memorandum informed Maack:  "Please understand that we are concerned about

your health and continued employment with the District.  We would like to make available

to you any of the services that the district can provide for your assistance."  (Id.).  Maack was

evaluated by the psychologist on the afternoon of April 6.  (Id.).  The psychologist's written

evaluation states in part:

> Mr. Maack stated that he has been diagnosed with Eppstein Barr Virus which is not a curable disorder with symptoms that included reduced physical energy and chronic pain. He is [being] treated medically by Dr. Rasul Faiaz [sic][7] in Cocoa, [Florida,] and is currently taking Percocet 10mg. TID for pain management. He was also prescribed Pristia [sic] which is an antidepressant, which he had not elected to begin at the time of this assessment.
>
> Mr. Maack did state that he had been involved with the over-use of prescription medications in the past and in the fall of 2009 attempted to sign into a drug rehab program to address this issue. He reported he could not find a program that would admit him so he withdrew from the substance as an outpatient and discontinued taking the medication. He had made his supervisor and employer aware of this situation at that time. No medical or legal complications were identified. He noted that he is following his physician's specific directions since that time. Mr. Maack noted that he recognized his increased dependency on the drugs and elected to stop on his own.
>
> <u>Behavioral Observations:</u>
>
> Mr. Maack presented as a physically stable somewhat depressed individual. . . . He was openly responsive to the interview questions but seemed rather upset and annoyed that he was directed to attend the appointment. . . . He stated that he . . . felt fully mentally and physically able to continue to perform his job duties. . . .
>
> . . . Mr. Maack stat[ed] he would attend additional session[s] "only if" he was required to do so by his employer and as long as they were 1) closer to home and 2) during work time.

(<u>Id.</u>). In the "Conclusion" section of the evaluation, the psychologist recounted: "Mr. Maack was referred for a mental status assessment . . . . He had been required to attend a 'Disciplinary Meet' due to numerous absences, 'No call, no show'. His employer stated concerned [sic] over Mr. Maack's reasons for the absences being possibly related to emotional/medical concerns." (<u>Id.</u>). The psychologist recommended that Maack attend six

---

[7]The medical records and other evidence indicate that the doctor's name is Faiaz Rasul rather than Rasul Faiaz.

more counseling sessions and start taking the antidepressants that had been prescribed by Dr. Rasul.  (Id.).  The School Board did not require Maack to attend additional counseling sessions, and he did not attend any more.  Maack did, however, take antidepressants after his EAP counseling session.[8]

On Monday, April 12, and Tuesday, April 13, Maack was a no call, no show. (Summary of Time at 2).  In his deposition, Mr. Maack testified that on April 14, he provided a note from Dr. Rasul excusing his April 12 and 13 absences and approving him to return to work on the 14th with a restriction to work no more than eight hours.  (Pl. Dep. at 40, 55-57; Medical Approval to Return to Work, Pl.'s Ex. H).[9]  According to Maack, when he handed Hudson the note with the eight-hour restriction, Hudson read the note and said, "Well, that's not going to happen" and told him to go back to work.  (Pl. Dep. at 55-59).  Hudson denies that Maack ever gave him this note or any doctor's note restricting Maack to eight hours of work per day.  (Hudson Dep., Def.'s Ex. F, at 46-47).

On Thursday, April 15, Maack reported to work, worked 3 hours, and then left for the rest of the day.  (Summary of Time at 2).  On Monday, April 19, he reported to work and

---

[8]Although the psychologist noted in the evaluation that Maack had not started taking the antidepressant that his doctor had prescribed, Maack testified in his deposition that he began taking antidepressants in 2009 and that as of April 2010, he was "still trying them." (Pl. Dep. at 33).  Additionally, while the psychologist evaluation states that Maack was taking Percocet, Maack testified in his deposition that as of April 2010 he was not taking any prescription medication other than anti-depressants and that he was not taking any pain medication except perhaps Tylenol.  (Id. at 34).  Medical records indicate renewals of Maack's Percocet prescription in April and May 2010.  (See Pl.'s Ex. B).

[9]The approval to return to work contains no information about Maack's medical condition.  (Pl.'s Ex. H).

worked most of the day but left one hour early—apparently after working nine hours.  (Id.).

On Wednesday, April 21, he was a no call, no show.  On Thursday, April 22, Walt Petters,

the Director of Maintenance, sent Maack a certified letter informing him that effective that

day, the School Board was "accepting [his] resignation" as a "result of [his] continued non-

compliance to report to [his] assigned work location or to provide notification to [his]

Supervisor of [his] absence."  (Pl.'s Ex. N).

After receiving the April 22 letter, Maack spoke to Hudson and someone at the

union.[10]  (Pl. Dep. at 42).  Additionally, he presented a Medical Approval to Return to Work

note from Dr. Rasul's office to Hudson excusing his absences from April 21 to April 29 and

authorizing a return to work on April 30 without any restrictions.  (Pl. Dep. at 41; Medical

Note, Pl.'s Ex. M).  Maack does not recall when exactly he presented this note to Hudson,

but Hudson would not accept it.  (Pl. Dep. at 41-42).  The union person told him to speak to

Joy Salamone, the School Board's Director of Human Resources.  (Id. at 42-43).  He spoke

to Salamone in person and asked for his job back, and according to Maack, Salamone told

him there was "just cause" for his termination.  (Id. at 43).[11]

On December 14, 2010, Maack filed a Charge of Discrimination with the Florida

---

[10]Employees of Maack's type were covered by a Collective Bargaining Agreement ("CBA") between the School Board and the International Union of Painters and Allied Trades Local 1010.  (Def.'s Ex. H).  Maack was not a member of the union at the time his employment ended, but he was nevertheless covered by the CBA.

[11]Salamone maintains that Maack was not terminated but resigned by failing to show up for work.  (Salamone Dep., Def.'s Ex. J, at 87-88).  Although the parties dispute whether Maack "resigned" or was terminated, it is clear that Maack's separation from employment was involuntary in the sense that he did not want it to occur.  The Court does not ascribe significance to the terminology used to describe the cessation of his employment.

Commission on Human Relations.  (Def.'s Ex. N).  In that charge, Maack alleged that he had

been discriminated against based on a disability/handicap, stating that he had an adverse

reaction to antidepressants on April 21, 2010 and was unable to call into work.  (Id.).  On

December 16, 2010, Maack applied for social security disability benefits, stating on his

application that he "became unable to work because of [his] disabling condition[12] on April 1,

2010."  (Def.'s Ex. W).

Maack filed this lawsuit on April 23, 2012.  (Doc. 1).  The School Board now seeks

summary judgment on all four of the claims in the Amended Complaint (Doc. 17).

## II.  Summary Judgment Standards

"The court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a).  In ruling on a motion for summary judgment, the Court construes the

facts and all reasonable inferences therefrom in the light most favorable to the nonmoving

party.  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000).  However,

when faced with a "properly supported motion for summary judgment, [the nonmoving party]

must come forward with specific factual evidence, presenting more than mere allegations."

Gargiulo v. G.M. Sales, Inc., 131 F.3d 995, 999 (11th Cir. 1997).

Summary judgment is mandated "against a party who fails to make a showing

sufficient to establish the existence of an element essential to that party's case, and on which

that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322

---

[12]The summary of Maack's social security disability application that has been filed with
the Court (Def.'s Ex. W) does not describe Maack's "disabling condition."

(1986).  "Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative."  Sawyer v. Southwest Airlines Co., 243 F. Supp. 2d 1257, 1262 (D. Kan. 2003) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-51 (1986)).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  Anderson, 477 U.S. at 249.  "Essentially, the inquiry is 'whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law.'"  Sawyer, 243 F. Supp. 2d at 1262 (quoting Anderson, 477 U.S. at 251-52); see also LaRoche v. Denny's, Inc., 62 F. Supp. 2d 1366, 1371 (S.D. Fla. 1999) ("The law is clear . . . that suspicion, perception, opinion, and belief cannot be used to defeat a motion for summary judgment.").  "[T]he summary judgment rule applies in job discrimination cases just as in other cases.  No thumb is to be placed on either side of the scale."  Chapman v. AI Transp., 229 F.3d 1012, 1026 (11th Cir. 2000).

### III.  Discussion

#### A.  FMLA Claims

Two of Maack's four claims are brought under the FMLA.  "The FMLA's central provision guarantees eligible employees 12 weeks of leave in a 1-year period," Ragsdale v. Wolverine World Wide, Inc., 535 U.S. 81, 86 (2002), including for "a serious health condition that makes the employee unable to perform the functions of the position of such employee," 29 U.S.C. § 2612(a)(1)(D).  "Leave must be granted, when 'medically necessary,' on an

intermittent or part-time basis," and "[u]pon the employee's timely return, the employer must reinstate the employee to his or her former position or an equivalent." Ragsdale, 535 U.S. at 86 (citing 29 U.S.C. §§ 2612(b)(1) & 2614(a)(1)).  "The Act creates a private right of action to seek equitable relief and money damages against employers who 'interfere with, restrain, or deny the exercise of or the attempt to exercise' FMLA rights."  Hurlbert v. St. Mary's Health Care Sys., Inc., 439 F.3d 1286, 1293 (11th Cir. 2006) (quoting 29 U.S.C. § 2615(a)(1)).

The Eleventh Circuit has "recognized that [the FMLA] creates two types of claims: 'interference claims, in which an employee asserts that his employer denied or otherwise interfered with his substantive rights under the Act, and retaliation claims, in which an employee asserts that his employer discriminated against him because he engaged in activity protected by the Act.'"  Id. (citing 29 U.S.C. § 2615(a) and quoting Strickland v. Water Works & Sewer Bd. of Birmingham, 239 F.3d 1199, 1206 (11th Cir. 2001)).  Maack alleges both types of FMLA claims in this case.

1.  Count I—FMLA Interference

In Count I of the Amended Complaint, Maack alleges that the School Board violated the FMLA by interfering with or denying his rights under that statute.  To establish a claim of interference with a substantive right under the FMLA, an employee must "demonstrate by a preponderance of the evidence that he was entitled to the benefit denied."  Strickland, 239 F.3d at 1206-07.  Because Maack has not presented evidence showing entitlement to an FMLA benefit that he was denied, Count I fails.

In order to have been entitled to leave under the FMLA, Maack must have suffered

from "a serious health condition that ma[de him] unable to perform the functions of [his] position," 29 U.S.C. § 2612(a)(1)(D).  And, to establish an FMLA violation, Maack must have provided notice to the employer "'sufficient to make the employer aware that the employee needs FMLA-qualifying leave[] and the anticipated timing and duration of the leave.'"  Wai v. Fed. Express Corp., 461 F. App'x 876, 882 (11th Cir. 2012) (quoting Cruz v. Publix Super Mkts. Inc., 428 F.3d 1379, 1383 (11th Cir. 2005)).  Such notice "need not be in writing or refer specifically to the FMLA," and if the employee "'gives sufficient notice to h[is] employer that potentially FMLA-qualifying leave is needed, the employer must then ascertain whether the employee's absence actually qualifies for FMLA protection.'"  Id. (quoting Cruz, 428 F.3d at 1383).

In arguing that he suffered from an "serious health condition" within the meaning of the FMLA, Maack relies on his diagnoses of Eppstein-Barr and fibromyalgia and his use of prescription medications.  Although the diagnoses of several conditions are evident from the record, Maack has not presented evidence that any of these conditions made him unable to perform the functions of his job at the School Board.  Additionally, he has not presented evidence that he made the School Board aware of these conditions or his need for FMLA leave.

Maack only conclusorily asserts an inability to perform his job, and his position as to his ability to function in April 2010 fluctuated throughout that month and beyond.  On April 6, he told the EAP psychologist that he "felt fully mentally and physically able to continue to perform his job duties."  (Def.'s Ex. K).  Eight days later—accepting his testimony as

true[13]—he presented a doctor's note restricting his work to a maximum of eight hours per day; that note provided no explanation of Maack's condition, the reason for the restriction, or the expected duration of the restriction.  Two weeks later, after Maack's employment had ended, Maack presented a doctor's note authorizing him to work without any restrictions as of April 30.  Then, in December 2010, Maack applied for Social Security disability benefits and represented that as of April 1, 2010, he "became unable to work because of [a] disabling condition."  (Def.'s Ex. W).

Maack has not presented evidence establishing that any of his conditions rendered him unable to perform his job or even showing that these conditions were the reason for his absences.  Indeed, the record indicates that twice during April 2010 Maack indicated that he was fully able to perform the functions of his job without restrictions.

And, even if Maack had presented evidence that he suffered from a serious health condition that rendered him unable to perform the functions of his job, he failed to advise his employer of any such condition or inability to function.  Maack vaguely asserts that the School Board knew of his medical problems—citing references in the School Board's letters to "concern about his health."  Maack also contends that the School Board was obligated to inform him of his FMLA rights, but the School Board has presented evidence that FMLA information was posted on a bulletin board next to the timeclock used by Maack as well as online, and these postings are sufficient to comply with an employer's notice obligations under the FMLA.  See 29 C.F.R. § 825.300(a).  The Court cannot conclude that a doctor's

---

[13]As earlier noted, Hudson denies being given this note, but at the summary judgment stage the Court must accept as true the non-moving party's version of the facts.

note with a one-time restriction is sufficient to alert the School Board of Maack's purported desire for FMLA leave.  Furthermore, the School Board repeatedly offered to assist Maack, but Maack did not avail himself of that assistance.

In light of Maack's failure to establish that he was entitled to FMLA leave or that he informed his employer of his medical conditions or his desire for FMLA leave, the FMLA interference claim fails.[14]  Summary judgment shall be granted in favor of the School Board on Count I.

### 2.  Count II—FMLA Retaliation

In Count II, Maack contends that the School Board terminated him in retaliation for seeking medical leave covered by the FMLA.  "[T]o succeed on a retaliation claim, an employee must demonstrate that his employer intentionally discriminated against him in the form of an adverse employment action for having exercised an FMLA right." Strickland, 239 F.3d at 1207.  "In other words, a plaintiff bringing a retaliation claim [must show] that his employer's actions 'were motivated by an impermissible retaliatory or discriminatory animus.'" Id. (quoting King v. Preferred Technical Grp., 166 F.3d 887, 891 (7th Cir. 1999)). "When a plaintiff asserts a claim of retaliation under the FMLA, in the absence of direct evidence of the employer's intent, [courts] apply the same burden-shifting framework established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792

---

[14]To the extent Maack's interference claim is based on his October 2009 absence for drug rehab, the claim also fails.  Treatment for substance abuse is, in some circumstances, FMLA-protected, see 29 C.F.R. § 825.119, but even if Maack's treatment qualified for such protection he has not established that he was denied leave for that treatment.  Indeed, he took the leave, allegedly with Varney's permission.

(1973), for evaluating Title VII discrimination claims." Strickland, 239 F.3d at 1207.  Maack has not presented any direct evidence of retaliatory intent, and thus the Court evaluates his FMLA retaliation claim under the McDonnell Douglas scheme.

Under this framework, the plaintiff has the initial burden to establish a prima facie case of discrimination by a preponderance of the evidence.  "Demonstrating a prima facie case is not onerous; it requires only that the plaintiff establish facts adequate to permit an inference of discrimination." Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997).  If the plaintiff establishes a prima facie case, a presumption of discrimination arises.  See, e.g., Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254 (1981).  Once the plaintiff has presented a prima facie case and its attendant presumption, the burden "shift[s] to the employer to articulate some legitimate, nondiscriminatory reason" for its actions. McDonnell Douglas, 411 U.S. at 802.  "If the [employer] does so, the plaintiff must then show that the defendant's proffered reason for the adverse action is pretextual."  Hurlbert, 439 F.3d at 1297.

To make a prima facie showing of FMLA retaliation, a plaintiff must establish:  (1) that he engaged in activity protected by the FMLA; (2) that he was subjected to a materially adverse action by her employer; and (3) a causal connection between the activity and the adverse action. See Strickland, 239 F.3d at 1207; see also Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 57 (2006) (refining retaliation standard to include "materially adverse actions" and not only "adverse employment actions").

Maack has not presented evidence that he engaged in FMLA-protected activity.  It is undisputed that he never requested FMLA leave, and he also never gave the School Board

information that would advise it that his 2010 absences were potentially FMLA-qualifying.[15]

See, e.g., 29 C.F.R. § 825.303(b) ("Calling in 'sick' without providing more information will

not be considered sufficient notice to trigger an employer's obligations under the [FMLA].").

The School Board repeatedly expressed concern about Maack and offered its assistance,

but Maack responded, at best, by indicating that he was fully able to perform his job.  And,

again, the April 14 note cannot be construed as notice of a need for leave that was

potentially FMLA-qualifying.

Furthermore, even if Maack were deemed to have engaged in protected FMLA activity

through presentation of the April 14 note, his retaliation claim would fail at the third prima

facie element.  While it is undisputed that Maack suffered an adverse employment action

when he was deemed to have resigned, to establish a causal connection a plaintiff must

show "that the protected activity and the adverse action were not wholly unrelated."

Simmons v. Camden Cnty. Bd. of Educ., 757 F.2d 1187, 1189 (11th Cir. 1985).  Generally,

close temporal proximity is enough to satisfy a causal connection.  Brungart v. BellSouth

Telecomms., Inc., 231 F.3d 791, 799 (11th Cir. 2000).  In this case, the temporal proximity

was close—approximately one week.  However, intervening events can negate the inference

of causation that may arise from temporal proximity.  See Hankins v. AirTran Airways, Inc.,

---

[15]Even assuming that Maack's October 2009 absences for substance abuse treatment were FMLA-qualifying, there is no evidence that Maack suffered an adverse action due to taking that leave.  He was issued warning letters about those absences, but he did not suffer job consequences.  When his absences began again in the spring of 2010, the School Board again sent him letters but did not rely on the October 2009 letters as an earlier phase in a progression of discipline; instead, the School Board "started over" even though, as discussed later, it was not required to follow progressive discipline.

237 F. App'x 513, 520 (11th Cir. 2007) (noting, in discussing prima facie case, that "close temporal proximity between two events, standing alone, is not a panacea, absent any other evidence that the employment decision was causally related to the protected activity"); accord DeLeon v. ST Mobile Aerospace Eng'g, Inc., 684 F. Supp. 2d 1301, 1325 (S.D. Ala. Feb. 9, 2010) ("The Eleventh Circuit has made clear that even if a plaintiff is terminated in close temporal proximity to [protected activity], a plaintiff's intervening act of misconduct severs the causal connection between the [protected activity] and the decision to terminate her employment." (citing Hankins)).

Throughout the spring of 2010, Maack continued to violate the requirement that he call in on days he would be absent—a transgression regarding which he had been repeatedly warned and counseled.  His continuing noncompliance with that requirement severed the inference of causation that might otherwise arise from close temporal proximity.

Even if the Court assumed that the inference was not severed and that Maack had established a prima facie case, Maack's case would fail at the pretext stage of the analysis. In other words, if Maack's noncompliance with the call-in requirement is not viewed as cutting off the causation prong of the prima facie case, it certainly satisfies the School Board's burden of articulating a legitimate, nondiscriminatory reason for Maack's termination, and Maack has failed to present evidence sufficient to survive summary judgment regarding whether the School Board's reason is merely a pretext for FMLA retaliation.  See, e.g., Chapman, 229 F.3d at 1024-25 ("If the plaintiff does not proffer sufficient evidence to create a genuine issue of material fact regarding whether each of the defendant employer's articulated reasons is pretextual, the employer is entitled to summary judgment on the

plaintiff's claim.").

Maack argues in his summary judgment response that "[t]he only reason advanced by [the School Board] for disciplining and terminating [Maack] is [the School Board's] claim that [Maack's] absences from work were unexcused." (Doc. 39 at 14). This assertion is inaccurate, however. Maack not only repeatedly failed to show up for work, he also repeatedly failed to call in to advise his employer that he would not be showing up for work.[16] Maack acknowledged in his deposition that he was supposed to call in to let the School Board know if he would not be reporting to work. Maack does not contest the School Board's records regarding his absences or his failure to call in, and he admits that he frequently did not call in as required, sometimes because "it was just too stressful and too embarrassing," (Pl. Dep. at 18-19).

Despite acknowledging his failure to report, Maack contends that his noncompliance with the call-in policy is merely a pretext for FMLA retaliation. This argument fails. "To show pretext, a plaintiff must come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." Hurlbert, 439 F.3d at 1298 (internal quotations and citations omitted). In determining whether an issue has been raised as to pretext, this Court "must, in view of all the evidence, determine whether the plaintiff has cast sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the

---

[16]Indeed, for eleven of the last twenty-four working days of Maack's employment, Maack was a "no call, no show." (See Summary of Time).

employer's proffered legitimate reasons were not what actually motivated its conduct." Combs v. Plantation Patterns, 106 F.3d 1519, 1538 (11th Cir. 1997) (citation and internal quotation omitted).  This determination involves an "evaluat[ion of] whether the plaintiff has demonstrated 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence.'" Id. (quoting Sheridan v. E.I. DuPont de Nemours & Co., 100 F.3d 1061, 1072 (3d Cir. 1996)).

Applying these standards, Maack has not presented evidence sufficient to create a genuine issue of material fact regarding whether the School Board's reason for terminating him was merely a pretext for unlawful retaliation.  Maack attempts to raise an issue as to pretext by arguing that the School Board did not comply with the progressive discipline policy, pursuant to which he allegedly was to be given a suspension without pay before being terminated.[17]  However, failure to call in can be characterized as misconduct or willful neglect of duty, subject to immediate termination.  (See, e.g., Hudson Dep. at 38).  The fact that the School Board warned Maack before terminating him for his noncompliance with the call-in requirement does not render suspect its failure to follow the steps of progressive discipline.

---

[17]Under the CBA, an employee of more than ninety days was not to be discharged "except for just cause." (Def.'s Ex. H at 21).  "Just cause" is described as including but not being limited to use of drugs; harming School Board property; and "[s]tealing, dishonesty, misconduct, or willful neglect of duty." (Id. at 21-22).  Such offenses "shall be cause for immediate termination." (Id. at 21).

The CBA also provides for progressive discipline. (Id. at 22).  Corrective measures specified in the CBA are:  first offense—oral warning; second offense—written warning and/or written reprimand; third offense—suspension without pay for no more than three days; and fourth offense—termination.

Indeed, the record reflects that the School Board was extremely patient with Maack and tolerated far more from Maack than many employers would have or should be expected to. Furthermore, the School Board aptly argues that requiring issuance of a suspension under the circumstances of this case would be nonsensical.  (See Def.'s Reply Mem. at 5 n.3 ("[T]he idea that the School Board should have disciplined [Maack], in an effort to correct his misconduct, by suspending him from work for three days, where the problem was that he would not come to work, is irrational.")).

None of Maack's assertions casts doubt on the School Board's explanation for the termination of Maack's employment.  The School Board had repeatedly warned Maack regarding his failure to call in, and Maack has readily and repeatedly acknowledged that he often failed to do so.  Thus, he has admitted violating School Board policy and repeated specific directives.  Cf. Greer v. Cleveland Clinic Health Sys.—East Region, 503 F. App'x 422, 429-30 (6th Cir. 2012) ("Despite [the plaintiff's] utter lack of communication with the [defendant] about his attendance issues, he expects the [defendant] to have intuited that they were related to his medical conditions and, further, asks this court to find that the [defendant] violated the FMLA in holding [the plaintiff] accountable for his violations of the [defendant's] attendance policy.  We decline to do so and find that the district court properly granted the [defendant's] motion for summary judgment . . . .").

In sum, even if Maack were given the benefit of the doubt as to whether he can establish a prima facie case of FMLA retaliation, his claim fails at the pretext stage of the McDonnell Douglas analysis.  The School Board's motion for summary judgment shall be granted on Maack's FMLA retaliation claim.

B.  ADA Claims

1.  Count III—Disability Discrimination

Maack asserts in Count III that the School Board discriminated against him based on a disability or perceived disability in violation of the ADA and that the School Board denied him a reasonable accommodation.  In its summary judgment motion, the School Board argues that Maack cannot prevail on his disability discrimination claim because he cannot establish that he had a "disability" within the meaning of the ADA or that he made an accommodation request.  The Court agrees with the School Board.

"Disability" is defined by the statute as:  "(A) a physical or mental impairment that substantially limits one or more major life activities of [an] individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment."  42 U.S.C. § 12102(1).  Maack relies on the first and third of these definitions, but he has not established either of these alternatives.

First, Maack has not presented evidence that he suffered from "a physical or mental impairment that substantially limits one or more of [his] major life activities."  In arguing that he had a disability, Maack relies on his diagnoses of fibromyalgia and Eppstein-Barr virus and on "his use of prescription medications that caused severe side effects and dependency."  (Doc. 39 at 16).  As earlier noted, Maack's medical records do indicate diagnoses of several different conditions, but these diagnoses do not in and of themselves establish that these conditions substantially limited a major life activity.  See Cash v. Smith, 231 F.3d 1301, 1305 (11th Cir. 2000) ("It is not disputed that [the plaintiff] suffers from a number of medical conditions that could each be regarded as impairments.  The question,

however, is whether these impairments substantially limit one or more major life activities.").

Maack has not presented evidence that any of his diagnosed conditions substantially limited

any major life activity.  Indeed, on both April 6 and April 30, 2010, Maack indicated that he

was capable of working without restrictions.

Maack argues that "addiction to drugs—both legal and illegal—can qualify as a

disability if the addiction substantially limits one or more major life activit[ies], including the

life activity of working."  (Doc. 39 at 16 (citing Brock v. Lucky Stores, Inc., 2000 WL 288395

(N.D. Cal. Mar. 14, 2000))).  However, even assuming that Maack had such a potentially-

qualifying addiction, he has not shown how that addiction substantially limited a major life

activity.  Moreover, the only time Maack claims to have had a pain medication addiction was

in the fall of 2009, and even assuming that he was substantially limited at that time, Maack

has not explained how the School Board discriminated against him during that time period.

Maack was out of work for several weeks in October and November but then returned

without an absence issue until four months later, and he does not assert that his absences

in March and April were due to a drug addiction.  Indeed, in his deposition Maack denied that

his attendance problems were related to his dependency on pain killers, and he also testified

that as of April 2010 he was not taking any pain medication except perhaps Tylenol.  (Pl.

Dep. at 25, 34).  Maack has not established that he meets the definition of "disability" under

subparagraph (A) of 42 U.S.C. § 12102(1) through his diagnosed medical conditions or

otherwise.

Second, Maack asserts that the School Board "regarded him as" having an

impairment under § 12102(1)(C).  "[A] person is 'regarded as' disabled within the meaning

of the ADA if [the employer] mistakenly believes that the person's actual, nonlimiting impairment substantially limits one or more major life activities." Murphy v. United Parcel Serv., Inc., 527 U.S. 516, 521-22 (1999); accord Hilburn v. Murata Elecs. N. Am., Inc., 181 F.3d 1220, 1230 (11th Cir. 1999) (noting that "[a]s with actual disabilities, a perceived impairment must be believed to substantially limit a major life activity of the individual" in order to rise to the level of a "disability" under the statute).  Maack has identified no record evidence to support his bare assertions that the School Board "regarded him as disabled" within the meaning of the law.  On the contrary, the record shows that the School Board regarded Maack as a capable worker and expected him to come to work.[18]  Cf. Cash, 231 F.3d at 1306 (noting that in order for the plaintiff to establish that her employer regarded her as substantially limited in her ability to work, she had to prove that the employer "considered her as 'significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills, and abilities'" (quoting 29 C.F.R. § 1630.2(j)(3)(i))).

Even if Maack had established that he was disabled or regarded as disabled, he has not established discriminatory conduct by the School Board based on any such disability or perception.  Cf. Cunningham v. Nature's Earth Pellets, L.L.C., 433 F. App'x 751 (11th Cir. 2011) (affirming summary judgment where ADA plaintiff had engaged in excessive absenteeism and been given repeated warnings prior to termination).  He has not identified a similar worker who repeatedly violated the call-in policy yet was not terminated.  Thus,

_____

[18]"Working" is the only major life activity that Maack specifically identifies.

Maack's disability discrimination claim fails.

Due to Maack's inability to establish that he suffered from a disability, Maack's reasonable accommodation-based ADA claim also does not survive summary judgment. And, even if Maack had shown that he satisfies one of the definitions of disability, the Court could not conclude that the April 14 doctor's note restricting Maack to an eight-hour work shift constitutes a request for an ADA accommodation. See Hickmon v. TECO Energy, No. 8:10-cv-1147-T-30MAP, 2012 WL 39582, at *5 (M.D. Fla. Jan. 9, 2012) ("[P]ointing to a physician's note regarding light duty or part-time work, without something more, is insufficient to constitute a request for an accommodation under the ADA.").

### 2.  Count IV—ADA Retaliation

Maack also claims that the School Board retaliated against him in violation of the ADA after he requested an accommodation, including by ordering him to undergo a psychiatric evaluation[19] and by terminating him.  As noted above, however, Maack has failed to establish that he was a qualified individual with a disability or that he requested an accommodation for any such disability.  Additionally, as discussed with regard to the FMLA retaliation claim, Maack cannot establish the causal connection prong of a prima facie case of retaliation, and the School Board has articulated a legitimate nondiscriminatory reason for its termination of

---

[19]Maack was referred to the EAP psychologist before he allegedly requested an accommodation on April 14.  In support of this aspect of his retaliation claim, Maack therefore relies on the testimony of his father—who also worked as an electrician for the School Board—that he had previously told Maack's supervisor of a need for an eight-hour shift.  The Court declines to recognize or impose a requirement that an employer act on information from a parent of a non-incapacitated, adult employee regarding that employee's capabilities.  In any event, this portion of the claim fails for the reasons stated in the text.

Maack as to which Maack has not raised a genuine issue of material fact regarding pretext. The ADA retaliation claim fails as well.

IV.  Conclusion

In accordance with the foregoing, it is **ORDERED** and **ADJUDGED** as follows:

1.  Defendant School Board of Brevard County's Dispositive Motion for Summary Judgment (Doc. 32) is **GRANTED** as to all of Plaintiff's claims.

2.  All other pending motions are **DENIED as moot**.

3. The Clerk is directed to enter a judgment providing that Plaintiff takes nothing from Defendant on any of his claims.  Thereafter, the Clerk shall close this case.

**DONE** and **ORDERED** in Orlando, Florida this 15th day of November, 2013.

JOHN ANTOON II
United States District Judge

Copies furnished to:
Counsel of Record